WILLIAM L. REGNIER v. THE TERRITORY OF OKLAHOMA.

(Filed September 6, 1905.)

1. MURDER—Manslaughter in the First Degree. Where the indictment charges the crime of murder, and the evidence shows the crime to have been committed by lying in wait and shooting the the deceased, and the defense is that of an alibi, and no evidence is introduced on the trial by the defendant other than in support of his defense of alibi, and the testimony on behalf of the Territory shows a wilful and deliberate shooting, resulting in death, it is error in the instructions of the court to submit to the jury the question of the guilt or innocence of the defendant of the crime of manslaughter in the first degree, included in such indictment.

2. EVIDENCE—Res Gestae. Where in the trial of a person charged with the crime of murder it is shown that he was shot from ambush by some person about 175 yards distant, and shortly after the shooting the deceased said to his brother who was present at the shooting: "Do you know who did this?" The brother answering stated: "One of them was Will Regnier"; and the deceased replied: "Yes, and the other one was John Labrier." Held, such conversation was inadmissable as res gestae.

(Syllabus by the Court.)

*Error from the District Court of Beaver County; before J. L. Pancoast, Trial Judge.*

*Francis C. Price* and *O. T. Toombs,* for plaintiff in error.

*P. C. Simons, Attorney General,* for defendant in error.

Opinion of the court by

GILLETTE, J.: The plaintiff in error, William L. Regnier, was, in the district court of Beaver county, indicted and tried for the crime of murder in causing the death of W. A. Rowan, April 15, 1903. The jury trying the cause returned a verdict against him, finding him guilty of manslaughter in

the first degree; and on the 20th day of October following, after motions for a new trial and in arrest of judgment had been heard by the court and overruled, the court rendered judgment against plaintiff in error, sentencing him to fifteen years' confinement in the territorial prison. From this judgment and sentence the defendant (plaintiff in error) brings the case to this court, alleging error.

The facts in this case show that the deceased, W. A. Rowan, at the time of the shooting was engaged in the act of cutting a wire fence which separated two ranges in Beaver county. He was accompanied by his brother Charles Rowan, who was standing a short distance away from him. It appears that this line fence had been the subject of controversy between the settlers theretofore. While the deceased was in the act of cutting this fence with a pair of nippers, he was shot by some person who was ambushed behind some rocks on the side of the hill to the west of him, at a distance of about 175 yards. From the person so ambushed the deceased received two wounds, one a slight flesh wound in the side, the other through the arm, which caused his death. The brother who was with the deceased was shot at the same time through the leg, and one of their saddle horses was killed. Whoever fired the fatal shot was evidently lying in wait for the deceased, and fired it with the intent of killing or doing him great bodily harm. Upon the trial of the cause no defense was offered other than that of an *alibi,* and at the conclusion of the testimony the court in instructing the jury included in his instructions the following:

"The homicide to which the evidence may be applied in this case is either murder or manslaughter in the first degree."

To the giving of this instruction the defendant at the time excepted, and excepted to any instruction defining and authorizing the jury to consider the crime of manslaughter in the first degree.

Manslaughter in the first degree is defined by the statute of Oklahoma as follows:

"First, when perpetrated without a design to effect death by a, person while engaged in the commission of a misde-·meanor; second, when perpetrated without a design to effect death, and in a heat of passion, but in a cruel·and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

The instruction objected to was given by the court because of the language of the second subdivision of the statute above quoted: "When perpetrated without a design to effect death," the court remarking at the time sentence was pronounced as follows:

"The only reason in this case why the verdict should be manslaughter in the first degree instead of murder was a question as to whether or not the intent was absolutely to kill or simply to wound and maim."

We are of the opinion that the facts in this case do not submit to the jury the question of such intent.

A man is presumed to intend the natural and consequent result of his own act, and in this case there is a lying ·in wait showing a deliberate and premeditated purpose, and the shot fired from such a distance with the wonderful accuracy shown by the evidence in this case, precludes any idea other than that they were fired with a murderous design.

The statute of Oklahoma, sec. 2168 Wilson's Ann. Stat. provides:

"A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."

No circumstances were shown in evidence in this case intended or tending to show that the design with which the fatal shot was fired, was other than to effect death.    The guilty party was lying in wait, no words were or could be spoken, and no fact or circumstance is shown in evidence to raise a reasonable doubt as to what the design or purpose was when such shot was fired.    To submit to the jury under such circumstances the right to determine the intent, motive or purpose in firing such shot, would be equivalent to nullifying the statute, and permitting the jury to conclude at will, and not by force of the evidence, that there was a design to maim simply, and not to kill.

We think it was error under the circumstances of this case to submit to the jury for their consideration in arriving at a verdict any degree of homicide other than that charged in the indictment, which was murder.    A majority of the judges of this court hold that this error is one the defendant cannot complain of, but the writer of this opinion cannot agree with them in such conclusion.    (*Spark & Hanson v. U. S.*, 156 U. S., 51; *Stevenson v. U. S.*, 162 U. S. 313; *State v. Robinson*, 41 Pac. 51; *State v. Cale* 17 N. W. 183; *State v. Cantieny*, 24 N. W. 458; *State v. McPhail*, 81 Pac. 683; *Dickerson v. State*, 4 N. W. 321; *Talbirt v. State*, 47 S. E. 544; *Davis v. U. S.*, 165 U. S. 373.)

There is one other ground of error submitted in the assignments of error in this case which we will notice.

During the trial of the case, and while evidence was being taken on behalf of the Territory, Charles Rowan, a brother

of the deceased, who was present at the time the fatal shot was fired, testified with reference to the occurrence, and after detailing the circumstances of the shooting of his brother testified as follows:

"Q. About how far did you have to go?

"A. Something like thirty yards.

"Q. Something like thirty yards. Did you catch his horse?

"A. Yes sir.

"Q. What did you do with the two horses when you had them?

"A. Rode my horse and led my brother's horse back to him, leaned over and handed him the bridle reins.

"Q. What did he attempt to do then?

"A. Get on his horse.

"Q. I will ask you to state whether or not he did.

"A. No sir.

"Q. Why not?

"A. Because he had no use of his arm.

"Q. Well, what horse did he get on if he got on a horse?

"A. My horse.

"Q. I will ask you to state if about that time you had any conversation with your brother in regard to the identity of the parties who did the shooting?

"A. Yes sir.

"Q. Now, I will ask you to state what that conversation was?

"By the court: How long was it that this conversation occurred after the last shot was fired?

"A. Couldn't have been more than a minute.

"By the court: Who, if any one, was present besides you and your brother?

"A. No sir.

"By the court: Had your brother had any opportunity to talk to any other than yourself?

"A. No sir.

"By the court:   Up to that time?

"A.   No sir.

"Q.   State the conversation that took place where your brother was at that time?

"A.   When my brother got off my horse and before I started back after his horse he laid down on the ground, and as he laid down he says, 'Do you know who did this', and I says, 'One of them was Will Regnier.'

"Q.   You says, 'One of them was Will Regnier'?

"A.   I says, 'One of them was Will Regnier.'

"Q.   What Will Regnier?

"A.   The defendant.

"Q.   Go ahead.

"A.   My brother says, 'Yes, and the other one was John Labrier.'

"Q.   What did you do then?

"A.   Then after this conversation I went back and caught my brother's horse, and led him back and handed him the bridle reins and he tried to get on the horse and couldn't because he had no use of his arm, and then I helped him on my horse, and got on my brother's horse."

It is insisted that the admission in evidence of declarations of the deceased shown in the foregoing testimony, wherein a conversation is detailed between the witness and his deceased brother, "When my brother got off my horse and before I started back after his horse he laid down on the ground, and as he laid down he says, 'Do you know who did this?' and I says, 'One of them was Will Regnier'; my brother says, 'Yes, and the other one was John Labrier' ", is material error. This declaration was admitted by the court as a part of the *res gestae.*

In point of time at which the declaration was made with reference to the firing of the fatal shot, there is no objection, and it is shown to have .been made so soon afterwards that

the occurrence must have been the one thing uppermost in the minds of the parties, and as shown in the testimony was only a minute or two afterwards. There are many respectable authorities which hold that declarations made after a much greater lapse of time, are admissible as *res gestae*. Notably the case of *Lewis v. The State,* (Tex.) 15 S. W. 642, where an hour and a half is shown to have elapsed between the time of injury and the declaration objected to, the court in that case saying:

"In order to constitute declarations a part of the *res gestae,* it is not necessary that they were precisely coincident in point of time with the principal fact. If they spring out of the principal fact, tend to explain it, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous, and are admissible in evidence."

In *Johnson v. State* (Wyo.) 59 Pac. 761, the declaration under consideration was made within an hour after the injury, and discussing its admissibility the court say:

"Almost immediately after being shot, the deceased was carried into the house by the defendant and others. The defense offered to prove that, a short time after being carried in, the deceased, upon being asked how it occurred, said, 'Johnson shot me, but he did not intend to do it.' The witnesses say that they do not know how long after the shooting this statement was made; that it may have been half an hour or an hour; that it was not long. The evidence was excluded, as not being a part of the *res gestae.* The question is confessed to be one of much difficulty, and the cases are very numerous, and not very harmonious. The early rule was very strict that the declaration must be precisely contemporaneous with the main transaction charged as an offense. Later, it has been held that the element of time is not always material, that no general rule can be stated; but that each case must

stand upon its own facts.   But it seems to be generally held,
if the statement is mere narration, wholly unconnected with
the principal fact, it is inadmissible.   Upon the other hand,
if it springs spontaneously out of the principal fact, is in
direct connection with it, is illustrative and explanatory of it,
the declaration should be admitted, although it may be nar-
rative in form, and although it may be separated from the ·
principal fact by a lapse of time more or less considerable."

In *State v. Martin,* (Mo.) 28 S. W. 12, the court after
citing numerous authorities for its conclusion, states:

"These cases sufficiently indicate the manner in which
the courts apply the general principle which admits or ex-
cludes evidence as a part of the *res gestae,* and are clearly
distinguishable from those cases in which the narrative, un-
connected with the principal facts, is universally rejected.
Here we have a citizen going to his home in the night.   He
is assailed by a ruffian and stabbed to the heart.   Instinctively
he cries,'Police, Police'; and is seen to stagger and cry out,
'I'm fainting; I'm gone; catch me', and falls to the ground.
The witness who testified to these facts runs to his relief,
finds him covered with blood.   Knowing that a physician re-
sides only a block and a half down the street, he runs to his
house, rings the bell, and at once is answered the doctor can-
not come.   He runs back to the injured man.   In this short
interval an officer has arrived, and finding the man prostrate
and bleeding to death, inquired 'Who did it?' and is answered
by the dying man: 'Two niggers; one a little yellow fellow.'
No one has made any suggestion.   As said by Judge Bigelow,
this last statement may well be deemed a part of the sentences
he uttered immediately   after the fatal stab   was inflicted.
They are not mere narrative.   They are uttered in the pres-
ence of a witness who has heard his cries for the police, who
has seen him stagger and fall, covered with blood, and who
went at once to his relief and found him bleeding to death.
It was not then a mere narrative, unsupported by the prin-
cipal facts, but it is in direct connection with it, and illus-

trative and explanatory of it. No sensible man would reject such evidence in his own affairs. We think the court committed no error in holding it competent."

We do not think, however, that the admissibility of the testimony in question turns upon the point of time the statement was made. The declaration of the deceased was not a declaration indicative of what or who had caused the injury. It was a question rather which would indicate that the deceased was seeking information, rather than giving expression to what naturally and irresistibly arose in his mind by reason of the occurrence. His declaration was made to his brother and was: "Do you know who did this?" and after his brother had stated that it was the defendant Regnier, he answered: "Yes, and the other one was John Labrier." This we think was mere colloquy between the brothers, the deceased seeking information and consenting to the information received.

We are unable to find any case which supports the admission of evidence of this kind, where the meaning of the declarant is left in doubt, that is, doubt as to whether he was declaring a fact to exist, which declaration was a part of the transaction itself "speaking through the instinctive words of the participant when narrating the event" or an inquiry as to how it happened, and by whom the injury was done.

It is not shown that he had seen his assailants, who were hid 175 yards distant, and we cannot assume that he could recognize them if he had seen them at that distance. It is a matter of common knowledge that the human features are not clearly distinguishable at that distance, and only the upper part of the person firing the shot is shown to have been at all visible.

Under such circumstances it would seem to be more consistent that the injured man, in the question propounded, was seeking information, and by his acquiescing in the information received was giving expression to his belief, rather than announcing a fact which had just then occurred within his knowledge.

In this connection it may not be amiss to notice the distinction in this respect between the cases relied on by the Territory and the case at bar.

In *Pauls v. A. O. U. W.* 102 N. W. 155, action to recover life insurance, company defended liability on the ground that death was the result of intoxication; witnesses were permitted to testify that the deceased while suffering from acute pains in the stomach stated that he had taken some medicine, and the court held that the declaration was a part of the *res gestae.*

In *U. S. v. Mosley,* 75 U. S. 397, the point at issue was the liability of the company to Mrs. Mosley upon the insurance policy of her husband for her use, and the question at issue was whether the assured died from the effect of accident, a fall down stairs at night, or from natural causes. Mrs. Mosley was permitted to testify that the assured left his bed between twelve and one o'clock at night and when he came back he said that he had fallen down the back stairs and almost killed himself; that he hit the back of his head in falling down stairs. Witness said that she noticed that his voice trembled; he complained of his head, and appeared to be faint and in great pain. The evidence was held competent.

In the case of *Keing v. Foster,* cited in *Insurance Co. v. Mosley, supra,* the defendant was indicted for manslaughter for killing the deceased by driving a cab over him. A wag-

oner was called as a witness for the prosecution and stated that he saw the cab drive by at a very rapid rate, but did not see the accident. Immediately after hearing the deceased groan, he went to him and asked what was the matter. It was held that what the deceased said at the instant as to the cause of the accident was admissible.

In *State v. Martin,* (Mo.) 28 S. W. 12, *supra,* the deceased was stabbed with a knife, called for the police, and ran or walked a few feet and fell down, exclaiming, "I'm fainting, I am gone, catch me." An officer some five minutes afterwards said "Do you know who did it?" and he answered, "Yes, two niggers, one a little yellow fellow." The declaration was held competent.

In *Lewis v. The State* 15 S. W. 642, the deceased was killed with a knife or razor. The deceased immediately after being injured stated to her friends that he, meaning the defendant, has cut me all to pieces. Proof of this declaration was held competent.

In *Linderberger v. Crescent Mining Co.,* 33 Pac. 692, the plaintiff shortly after the injury stated the manner of his injury, which statement was offered in evidence: *Held,* competent.

In *Pierce v. Van Dusen,* 78, Fed. 693, the declaration of a train conductor, made at the moment of a trainman's injury, describing his own part in bringing about the motion that effected the injury, was held admissible as a part of the *res gestae.*

It will be observed that in each of these cases the declaration challenged was made under such circumstances that the person making them must inevitably have known what the fact was. There is nothing left to conjecture, and the mean-

ing of these declarations was plain and unequivocal. We are of the opinion that the declaration of the deceased, received in evidence in this case, is not supported by these authorities.

In Gillett on Indirect and Collateral Evidence, sec. 254, cited in 1st Elliott on Evidence, sec. 548, the test of admissibility of such evidence, is stated as follows:

"Were the facts talking through the party, or the party talking about the facts?" If the latter, the declarations are mere narrative, and not admissible; citing 2nd. S. W. 592, and 66 N. E., 433; See also *Smith v. Territory* 11 Okla., 669.

In this case it seems to us clear that the deceased and his brother were talking about the facts and not the facts speaking through the declarations made. The admission of this testimony was error, prejudicial to the rights of the defendant, necessitating a reversal of the case.

The cause is therefore reversed and remanded to the district court of Beaver county, and a new trial awarded.

Pancoast, J., who presided in the court below, not sitting; all the other Justices concurring.